RECEIVED
IN ALEXANDRIA, LA.

AUG 2 3 2010

TONY R. ~~~~~
BY_____

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| CYNTHIA SHATTLES o/b/o J. S., Appellant | CIVIL ACTION NO. CV09-0761-A |
| VERSUS | |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, Appellee | JUDGE DEE D. DRELL MAGISTRATE JUDGE JAMES D. KIRK |

## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Note to Counsel

It is noted the counsels' pleadings violate Fed.R.Civ.P. rule 5.2(a) and the E-Government Act of 2002, Public Law 107-347 by failing to put *only* the minor's initials in the pleadings. Counsel are cautioned to comply with Rule 5.2 in the future or face the possibility of having their pleadings stricken.

### Facts and Procedural History

Cynthia Shattles Carter[1] (Shattles) filed an application for childhood supplemental security income ("SSI") benefits on behalf of her minor son, J.S. ("JS"), on November 10, 2005 (protective filing date) alleging a disability onset date of March 14, 2002 (JS's birthday) (Tr. p. 126), due to chronic asthma, bronchitis, acid reflux, and tubes in his ears (Tr. p. 142). That application was denied by the Social Security Administration ("SSA") (Tr. p.

---

[1] At the administrative hearing, Cynthia Shattles' name was Cynthia Carter (Tr. p. 45).

91).

A de novo hearing was held before an administrative law judge ("ALJ") on July 25, 2006 (Tr. p. 76), at which Shattles appeared with JS and an attorney. That hearing is not in the administrative record before this court. Therefore, evidence presented at that hearing will not be considered. The ALJ found that, although JS suffers from "severe" asthma, he did not have an impairment or combination of impairments that functionally meets or equals a listing and was not disabled within the meaning of the Social Security Act at any time through the date of the ALJ's decision on March 16, 2007 (Tr. pp. 76-85). On review, the Appeals Council remanded the case to the ALJ, ordering her to resolve issues and conflicts in the medical evidence by obtaining additional evidence concerning JS's pulmonary impairment, give further consideration to JS's maximum residual functional capacity and provide appropriate rationale, and obtain evidence from a medical expert to clarify whether JS's impairment meets or equals a listing (Tr. pp. 89-90).

A second administrative hearing was held on January 22, 2008, at which JS appeared with a witness, a medical expert, and his attorney (Tr. p. 28). The ALJ found that, although JS suffers from severe asthma and attention deficit hyperactivity disorder, he does not have an impairment or combination of impairments that meet or functionally equal a listed impairment in Appendix 1, he has less than marked limitations in every domain of functioning, and he was not disabled at any time through the date of the ALJ's decision on March 28, 2008 (Tr. pp. (14-27).

Shattles requested a review of the ALJ's second decision, but the Appeals Council declined to review it, and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner") (Tr. p. 1).

Shattles next filed this appeal for judicial review of the Commissioner's final decision (Doc. 6). The sole issue raised by Shattles for review on appeal is whether the ALJ and the Appeals Council erred in failing to cite any legal grounds that allow the ALJ to rebut finding JS is disabled per se at Step 3 pursuant to Listing 103.03B and/or 103.03C(2), in light of the medical evidence and the testimony of the medical expert.

The Commissioner filed a brief in response to Shattles' appeal (Doc. 9). Shattles' appeal is now before the court for disposition.

## SSI Benefits

Supplemental Security Income disability benefits, authorized by Title XVI of the SSA, provides assistance to the disabled needy without regard to the claimant's history of coverage under the Social Security Act. Its qualifying financial tests are income and resource tests. Ineligibility for DIB under Title II does not affect eligibility for SSI under Title XVI. Thomas v. Schweiker, 666 F.2d 999, 1001 (5th Cir. 1992). If a claimant filed an application for SSI benefits before the first month he meets all the other requirements for eligibility, the application remains in effect from the date it is filed until a final determination is made on the application, unless there is a hearing decision on the

application, in which case the application remains in effect until the hearing decision is issued. 20 C.F.R. § 416.330. If a claimant meets all the requirements for SSI eligibility after the period in which his application was in effect, he must file a new application for benefits. 20 C.F.R. § 416.330(b). The earliest month for which an eligible SSI claimant can receive benefits is the month following the month his application was filed, 20 C.F.R. § 416.335, or the month following the month during the pendency of the application that the claimant meets all the eligibility requirements, 20 C.F.R. § 416.330(a).

## ALJ's Findings

Under the evaluation process for determining whether a child is disabled, the ALJ has to determine (1) whether the child is engaging in substantial gainful activity; (2) if not, whether the child has a severe impairment; and (3) if so, whether the child has an impairment which (a) meets, (b) medically equals, or (c) functionally equals the severity of a listed impairment. 20 C.F.R. § 416.924. Also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (5th Cir. 2005); Jefferson v. Barnhart, 356 F.SUpp.2d 663 (S.D.Tex. 2004); Richardson ex re. C.R. v. Barnhart, 338 F.Supp.2d 749 (S.D.Tex. 2004). If a severe impairment is found, then it must meet the duration requirement to determine if the claimant is disabled. 20 C.F.R. 416.924. Medical equivalency exists if the child's impairment is at least equal in severity and duration to the medical criteria of the listed impairment. Moore ex rel. Moore, 413 F.3d at 721.

4

If a child's impairments do not meet or medically equal a listed impairment, a functional limitation assessment is done to determine whether the functional limitations are disabling (functional equivalence for children). 20 C.F.R. § 416.926a. In the functional equivalence approach, whether a child meets the "listing-level severity" standard is dependent on whether the child has marked limitations in two broad areas of development or functioning or extreme limitation in one of those areas. 20 C.F.R. § 416.926a. The broad areas of functioning are called "domains" - (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. To establish functional equivalence, a child must have a medically determinable impairment or combination of impairments that results in marked limitations in two domains or an extreme limitation in one domain. 20 C.F.R. § 416.926a. Also, Moore ex rel. Moore, 413 F.3d at 723.

A marked limitation is present where the impairment interferes seriously with one's ability to "independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a. An extreme limitation is present where one's impairment interferes very seriously with one's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a. An extreme limitation will be found if a child has a valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain, and

5

the day-to-day functioning in domain-related activities is consistent with that score. Moore ex rel. Moore, 413 F.3d at 723.

The ALJ found that JS has never worked, his severe impairments of ADHD and asthma did not result in any marked limitation in functioning, and he was not disabled at any time through the date of the ALJ's decision on March 28, 2008 (Tr. pp. 14-27).

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for

6

that of the fact-finder. <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987); <u>Dellolio v. Heckler</u>, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. <u>Allen v. Schweiker</u>, 642 F.2d 799, 801 (5th Cir. 1981). Also, <u>Anthony v. Sullivan</u>, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. <u>Dellolio</u>, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988); <u>Dellolio</u>, 705 F.2d at 125.

## Findings and Conclusions

After review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. §405(g), I find that there is substantial evidence in the record as a whole to support the Commissioner's decision of non-disability and the Commissioner's decision comports with all relevant legal standards. <u>Anthony v. Sullivan</u>, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of Fed.R.Civ.P. rule 52, I note that the Commissioner's findings and conclusions[2] put at issue by appellant are supported by substantial evidence, which can be outlined as follows.

---

[2] The relevant findings and conclusions are located in the administrative record at Transcript pages 14-25.

7

Shattles contends the ALJ erred in failing to cite any legal grounds that allow the ALJ to rebut finding JS is disabled per se at Step 3 pursuant to Listing 103.03(B) and/or 103.03(C)(2), in light of the medical evidence and the testimony of the medical expert. In other words, Shattles contends the ALJ erred in failing to find JS meets or equals Listing 103.03B and/or Listing 103.03C(2). Shattles further contends the ME's testified that JS meets a listing.

The medical expert ("ME"), Dr. George Robert Smith, a general surgeon, testified that he had reviewed JS's medical records and listened to the testimony (Tr. p. 54). The ME testified that JS has suffered from asthma, particularly in the first two to three years of his life when he had repeated hospitalizations with status asthmaticus-an emergency situation with asthma where the bronchial spasm cannot be broken, causing rapid deterioration in the patient's pulmonary and overall condition; intensive treatment at the hospital includes IV steroids (Tr. p. 55).

The ME testified that JS's asthma was getting better in 2005, as evidenced by his November 2005 hospital admission for "bronchial asthma exacerbation," which is less severe than status asthmaticus but still required bronchial dilator treatment, IV, and steroids (Tr. pp. 56-57). The ME testified that, in March 2006, JS's doctor noted his asthma was better, he was on fairly standard pediatric asthma treatment with standard use of the inhaler and standard use of low doses of steroids to prevent problems (Tr. p. 57). The ME testified that he is familiar with the listings and that, although

8

JS probably met the listings in the first two years of his life, in the last two years his asthma has been much better and easier to control and JS did not meet the listings then (Tr. p. 58). The ME testified that JS's health has improved because he probably has better home treatment and because he is bigger, so the structures in his head and neck are bigger and able to function better (Tr. p. 58).

The ME testified that JS does not meet the listings now or since November 2005 (Tr. p. 58). The ME further testified that JS does not functionally equal the listings, either; he only has heat intolerance from exercise (Tr. p. 58).

The ME also testified that, prior to November 2005, JS had a hospital admission for croup, asthma exacerbation, respiratory distress, and wheezing from December 6-10, 2003, a hospital admission for status asthmaticus, sinusitis and reflux from July 5-10, 2004, a second admission from June 16-19, 2004, a visit in October 2004 for moderate, persistent asthma and a followup visit one week later, March 9-11, 2005 for status asthmaticus with barky cough, a visit to the emergency room on November 7 and 9, 2005 for asthma, a July 2005 visit for acute bronchiolitis (an upper respiratory infection which is not asthma) and croupy cough with no active pulmonary disease, and a hospital visit on October 8 for asthma and bronchitis (Tr. pp. 59-64). The ME testified that JS met the listing from November 2004 through November 2005 for two hospitalizations and several other emergency visits (Tr. p. 64). The ME concluded that JS met Listing 103.03B through November 2005,

9

but he did not meet Listing 103.03C (Tr. pp. 65-67).

When asked about JS's continued use of steroids for his asthma, the ME stated that the use of oral or inhaled steroids is standard treatment for prevention of acute exacerbations (Tr p. 66). The ME explained that many years ago steroids were given only for status asthmaticus (Tr. p. 68). The ME stated there was a big change in asthma treatment when steroids were prescribed in low doses to prevent exacerbations (Tr. p. 68). The ME further stated that, although JS technically meets the "words" of Listing 103.03C because he takes steroids, that listing does not reflect current medical care (Tr. pp. 69-70).

A claimant has the burden of proving that his condition meets or equals an impairment listed in Appendix 1. Sullivan v. Zebley, 493 U.S. 521, 110 S.Ct. 885, 891-92, 107 L. Ed. 2d 967 (1990). Also, Selders v. Sullivan, 914 F. 2d 614, 619(5th Cir. 1990). Where the impairment is severe, the Commissioner must determine whether the impairment is so severe that the claimant will be presumed to be disabled. This determination is made by comparing the impairment to a specific Listing of Impairments in the SSA regulations. See 20 C.F.R. § 404, Subpart P, Appendix 1. If the claimant's condition is listed, or is medically equivalent to a listed impairment, the claimant is conclusively determined disabled. Cieutat v. Bowen, 824 F.2d 348, 351 n.1 (5th Cir. 1987). Also, Selders v. Sullivan, 914 F.2d 614, 619 n. 1 (5th Cir. 1990). The ALJ is charged with carefully considering all the relevant evidence and linking his findings to specific evidence. A bare and

10

summary conclusion that a plaintiff does not meet the criteria of any listing is beyond meaningful judicial review. Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001).

For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment." Sullivan v. Zebley, 493 U.S. 521, 531, 110 S.Ct. 885 (1990); Selders v. Sullivan, 914 F.2d 614, 619 (5th Cir. 1990); 20 C.F.R. § 404.1526 (medical findings must be at least equal in severity and duration to the listed findings); 20 C.F.R. § 416.926.

1.

Listing 103.00 concerns the respiratory system. The requirements for Listing 103.03(B) are:

> "103.03 Asthma. With: B. Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or **at least six times a year**. Each inpatient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks." [Emphasis added.]

Listing 3.00(C) defines "attacks," in pertinent part, as

> "*Attacks of asthma*, episodes of bronchitis or pneumonia or hemoptysis (more than blood-streaked sputum), or respiratory failure as referred to in paragraph B of 3.03, 3.04, and 3.07, *are defined as prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting.*" [Emphasis added.]

Shattles must prove JS had (1) at least six asthma attacks in

a twelve month period (each inpatient hospitalization for longer than 24 hours for control of asthma counts as two attacks), (2) which were prolonged symptomatic episodes lasting one or more days, (3) requiring intensive treatment (such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting), and (4) in spite of prescribed treatment and requiring physician intervention.[3]

Shattles argues JS had at least six asthma exacerbations from June 2004 through March 2005, and again from October 8, 2005 through March 18, 2006. The ME testified there was (1) a hospital admission from June 16-19, 2004, (2) a second admission for status asthmaticus, sinusitis and reflux from July 5-10, 2004, (3) a doctor visit in October 2004 for moderate, persistent asthma and a followup visit one week later, (4) March 9-11, 2005 for status asthmaticus with barky cough, (5) a visit to the emergency room on November 7 and 9, 2005 for asthma, a July 2005 visit for acute bronchiolitis (an upper respiratory infection which is not asthma) and croupy cough with no active pulmonary disease, and a hospital visit on October 8 for asthma and bronchitis (Tr. pp. 59-64). The ME testified that JS met the listing from November 2004 through November 2005 for two hospitalizations and several other emergency visits (Tr. p. 64). The ME concluded that JS met Listing 103.03B

---

[3] In her brief, Shattles misdefines an "attack" as "requiring physician intervention" (Doc. 6); the correct definition, as set forth above, states that each attack must last one or more days and require intensive treatment (as defined above) in a hospital, emergency room, or equivalent setting.

12

through November 2005.

Shattles filed the application for benefits for JS on November 10, 2005. Since the first month for which SSI benefits can be paid is the month following the month in which the application was filed, regardless of how far back in time the disability may extend, JS must meet the disability requirements during the time in which benefits may be paid, or beginning in December 2005. Therefore, the fact that JS met Listing 103.03(B) prior to filing his application is irrelevant given the fact that he no longer met the listing *after* November 2005. Compare, <u>Ricci v. Apfel</u>, 159 F.Supp.2d 12, 23 n.13 (E.D.Pa. 2001).

Therefore, Shattles did not meet her burden of proving JS meets Listing 103.03(B). Substantial evidence supports the ALJ's/Commissioner's conclusion that JS did not meet Listing 103.03(B).

2.

Shattles also argues that JS meets Listing 103.03(C)(2) for asthma, which requires:

> C. Persistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with one of the following:
> \*   \*   \*
> 2. Short courses of corticosteroids that average more than 5 days per month for at least 3 months during a 12 month period;"

The dispute in this case concerning Listing 103.03(C)(2) lies in the fact that JS takes inhaled corticosteroids for long-term therapy to control his symptoms. Shattles argues the ME testified

13

that JS meets the listing due to persistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators as well as his daily use of inhaled corticosteroids. Based on that fact, the claimant argues JS meets Listing 103.03(C)(2) due to steroid use. However, Listing 103.03(C)(2) refers to *short term steroids*, which are given orally or by injection to speed up the resolution of airway inflammation; it is referring to a quick relief, or rescue, drugs and not a low-dose inhaled corticosteroid which gives long-term control.[4]

---

[4] The American Academy of Asthma & Immunology explains asthma treatments in "Asthma Facts" (Jan. 2007), at http://www.aaaai.org/patients/topicofthemonth/0107/,, in pertinent part:
"What do asthma treatments include?
"Asthma management includes using proper medications to prevent and control asthma symptoms and to reduce airway inflammation. Asthma medications are thus categorized into two general classes, quick-relief and long-term control medications. Quick-relief medications that are used to provide temporary relief of symptoms include:
\* Bronchodilators, generally used as "rescue medications," open up the bronchial tubes so that more air can flow through. Bronchodilators include beta-agonists and anticholinergics, and come in inhaled, tablet, liquid or injectable forms.
\* Corticosteroids are administered for short-term use orally or by injection to speed up the resolution of airway inflammation.

"Long-term control medications are taken daily to control the airway inflammation in persistent asthma. This class includes:
\* Inhaled corticosteroids are the most effective long-term therapy available for persistent asthma. They are generally well tolerated and safe at recommended dosages... ."
See also, "Asthma" by the Mayo Clinic staff (May 2010) at

14

Only three other courts appear to have dealt with this issue. In <u>Collier ex rel. K.L.C. v. Astrue</u>, 2010 WL 481038 (S.D.Ind. 2010), citing <u>Sanchez ex rel. Sanchez v. Barnhart</u>, 2005 WL 752220 at *9 (W.D. Wis. 2005), affirmed <u>Sanchez v. Barnhart</u>, 467 F.3d 1081 (7th Cir. 2006), the district judge stated that, "[Although K.L.C. uses a corticosteroid inhaler on a daily basis (R. at 163), this is not the type of '[s]hort course of corticosteroids' contemplated by this Listing. ...Rather, Listing 103.03C2 requires the claimant to demonstrate use of 'long-term control medications' ... [, namely] oral and intravenous corticosteroids, such as prednisone and methylprednisolone, [which] are used to treat acute asthma attacks or severe persistent asthma."

In <u>Sanchez</u>, 2005 WL 752220 at *9, the district judge stated, "[P]laintiff's daily use of an inhaled corticosteroid is not the type of steroid use contemplated in Listing 103.03C2. As the commissioner points out, inhaled corticosteroids are long-term control medications used to prevent exacerbations by reducing inflammation in the airways. ... Low dose formulations of such inhaled corticosteroids, like that prescribed for plaintiff, are indicated for the treatment of mild persistent asthma. ... In contrast, oral and intravenous corticosteroids, such as prednisone and methylprednisolone, are used to treat acute asthma attacks or severe persistent asthma. Id. In general, because of the serious

---

http://www.mayoclinic.com/print/asthma/DS00021/METHOD=print&DSECTION=all.

15

side effects associated with the use of such steroids, they generally are not prescribed for long term use. ... It is clear that the commissioner's use of the term 'short courses of corticosteroids' in Listing 103.03C2 refers to this latter form of steroids and not to long-term, daily use of a steroid inhaler. To conclude otherwise would lead to the absurd result that thousands of children with only mild asthma could be found disabled under the Social Security Act."

Although one court has taken the opposite position and remanded the case with instructions for the ALJ that the term "corticosteroid" be interpreted to mean any type of corticosteroid, Correa v Commissioner, 381 F.Supp.2d 386, 396 (D.N.J. 2004), the reasoning given by the judge in that case fails to address the intent of the listing to find only severe and difficult to control cases of asthma to be per se disabling and, therefore, should not be followed by this court.[5]

---

[5] In Correa v Commissioner, 381 F.Supp.2d 386, 396 (D.N.J. 2004), the judge reasoned:

"The language of 103.03(c)(2) is clear and unambiguous. A child claiming disability must take 'short courses of corticosteroids that average more than five days per month for at least three months during a twelve month period.' The Listing specifies how often and for how long corticosteroids are to be taken, but is silent as to how the corticosteroids are to be administered. As Plaintiff points out, several parts of the disability listings were revised in 1997, yet the SSA chose not to amend Listing 103.03(c)(2). (Pl. Reply Br. at 10.) It would be unfair to allow an ALJ to create a distinction between inhaled and oral corticosteroids, when that distinction does not appear in the statute. A reviewing court need only defer to an interpretation when it is reasonable. See West v. Bowen, 879 F.2d 1122, 1124 (3d Cir.1989). On remand, the term 'corticosteroid,' shall be interpreted to include corticosteroids taken by any

16

In the case at bar, the ME testified that the use of oral or inhaled steroids in low doses is standard treatment today for *prevention* of acute exacerbations, but that many years ago steroids were given only for status asthmaticus (Tr. pp. 66, 68).

As the ME attempted to explain, the Listing 103.03(C)(2) refers to the short term use of quick relief steroids to treat asthma attacks, rather than to the long-term use of low dose steroids to prevent asthma attacks. This conclusion is supported by the fact that the listing describes listing-level asthma in terms of asthma attacks or persistent severe asthma *despite preventive treatment*. Listing-level asthma is not merely the existence of asthma which requires treatment to prevent attacks. Asthma that is controlled by preventive medication is simply not disabling. As stated in Sanchez, 2005 WL 752220 at *9, to find otherwise would lead to the result that thousands of children with only mild asthma could be found per se disabled under the Social Security Act.

Therefore, the ME's statement that JS meets the listing for use of corticosteroids due to his daily use of inhaled corticosteroids to control his asthma was incorrect for the very reason the ME believed the listing was outdated - Listing 103.03(C)(2) is expressly limited to "short course steroids," which are the quick relief steroids and not the long-term, low-dose

method of delivery."

17

preventive steroids.

Accordingly, Shattles has not shown that JS meets Listing 103.03(C)(2) due to use of short course corticosteroids since she has not shown that JS used quick relief corticosteroids the requisite number of times per year. Shattles may not rely on JS's use of long-term low-dose corticosteroid inhalers to satisfy Listing 103.03(C)(2).

Therefore, substantial evidence supports the ALJ's/Commissioner's conclusion that JS does not meet Listing 103.03(C)(2), and Shattles' appeal should be denied.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be AFFIRMED and that Shattles' appeal (Doc. 6) be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT**

**WITHIN fourteen(14) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 23rd day of August, 2010.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE

19